# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CHRISTOPHER LINGGI**, | Case No. 3:17-cv-1992-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **TE CONNECTIVITY CORPORATION**, | |
| Defendant. | |

Jessica Ashlee Albies and Whitney B. Stark, ALBIES & STARK, LLC, 210 SW Morrison Street, Suite 400, Portland, OR 97204. Of Attorneys for Plaintiff.

James M. Barrett and Christopher A. Morehead, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, 222 SW Columbia Street, Suite 1500, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Christopher Linggi ("Linggi") brings this lawsuit against his former employer

TE Connectivity ("TEC"), alleging that TEC retaliated against him by terminating his

employment for opposing and reporting what he believed to be legal wrongdoing during a U.S.

Food and Drug Administration ("FDA") inspection at his workplace. Plaintiff asserts state law

claims under Or. Rev. Stat. §§ 659A.030 and 659A.199 and for common law wrongful

discharge. TEC moves for summary judgment or, alternatively, for partial summary judgment. For the reasons that follow, TEC's motion is granted in part and denied in part.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

### A. TEC and Its Personnel

Plaintiff is a former employee of TEC, a company that designs and manufactures connectors and sensors for products used in a variety of industries, including the medical industry. TEC operates several facilities, including a facility in Wilsonville, Oregon that manufactures cables and subparts used in medical devices regulated by the FDA. Plaintiff worked for TEC in Wilsonville, Oregon from April 2012 through April 2015 and again from

November 2015 through March 2017. On March 17, 2017, TEC terminated Plaintiff's employment.

During Plaintiff's first period of employment at TEC (from April 2012 through April 2015), he worked as a manufacturing engineer. When he returned to TEC in November 2015, Plaintiff's position was Manager of Quality Systems. In that role, Plaintiff supervised TEC's quality management compliance at three facilities: Wilsonville, Oregon; Guyamas, Mexico; and Suzhou, China. Before working for TEC, Plaintiff had no previous experience in quality control.

When Plaintiff was rehired by TEC in November 2015, his supervisor was David Vose. Shortly thereafter, Vose left TEC. Plaintiff was next supervised remotely by Jeff Sears, who was responsible for Global Operations and Quality Assurance and Regulatory Affairs. Sears left TEC in June 2016. After Sears left, Plaintiff was directly supervised by Mark Andrews, the Senior Operations Manager in Wilsonville. Plaintiff also had a "dotted line" reporting relationship to Joan McCabe, TEC's Senior Vice President of Quality and Regulatory.

McCabe joined TEC in April 2016, when TEC acquired Creganna Medical, where she had been in charge of its Quality Department. McCabe was located in Galway, Ireland, but she and Plaintiff communicated by telephone on a semi-weekly basis. Andrews (Plaintiff's on-site supervisor) did not work in TEC's Quality Department.

**B. TEC's Planned Reduction in Force**

In April 2016, TEC acquired Creganna Medical, which had its own quality and operations departments. After the acquisition, TEC reorganized into two subdivisions: (1) Surgical and Cables; and (2) Interventional. Vish Ananthan was appointed to lead the Surgical and Cables Division. TEC determined that it needed to "right size" or restructure the Surgical and Cables Division through a reduction in force ("RIF"). The goals of the RIF included

reducing the number of TEC employees at the Wilsonville facility by 24 employees and reducing the number of TEC employees worldwide by 82 employees.

Kyleen Beistline, TEC's Senior Manager of Human Resources, and Vish Ananthan were jointly in charge of the RIF, although the names on the final RIF list were subject to final approval by TEC's corporate and legal departments. TEC scheduled layoffs associated with the RIF to take place in waves beginning in October 2016. On July 14, 2016, Beistline met with all department leaders to review employees that each leader had identified as potential candidates for the RIF. At this meeting, Mark Andrews identified Plaintiff as a potential candidate for the RIF. Andrews stated that he included Plaintiff on the RIF list because Plaintiff was one of the highest paid employees, yet Plaintiff's role was in flux and his duties had shrunk in scope as the nature of the organization was changing. When Plaintiff had been rehired into the Quality Department in November 2015, he supervised five employees, but by July 2016 that number had been reduced to three. Although performance was not a factor in Plaintiff's inclusion on the RIF list, the fact that that Plaintiff was relatively inexperienced and new to the role contributed to Andrews' decision to place Plaintiff on the RIF list. At the July 14 meeting, the department leaders also discussed whether Plaintiff should be moved to another position within the company, but ultimately decided to place Plaintiff's name on the RIF list.

On July 17, 2016, Beistline sent an email to Conrad Johnson at TEC, attaching a list of the names that the department leaders had suggested for the RIF. Plaintiff's name was included on that list. On September 13, 2017, Beistline sent another email, this time to Robert Rizzitello at TEC with a copy to Anthanan. This email included an updated RIF list, which also continued to contain Plaintiff's name. On September 22, 2016, Beistline emailed the latest RIF list to Lauren Breen, a labor and employment attorney at TEC, and Plaintiff's name remained on that list. On

September 27, 2016, a revised RIF list was sent to TEC's corporate group for approval. That list continued to include Plaintiff's name.

Any changes to the RIF list needed to be approved by Anthanan as well as by the finance and human resources departments. Throughout the months during which the RIF list was being modified, Plaintiff's inclusion on that list did not change. Although the RIF list was an evolving document and names would be removed if a listed employee retired or resigned, the consistent goal of the RIF list was to reduce the total number of employees, not to eliminate any specific employee. As a result, some employees whose names were initially on the RIF list were not ultimately terminated.

On October 7, 2016, Andrews met with Plaintiff to speak with him about the possibility of Plaintiff transferring to a position in TEC's engineering department, which was supervised by Bill Veith. Although the planned RIF was not yet generally known within TEC and Andrews could not tell Plaintiff that his name was on the RIF list, Andrews hoped to encourage Plaintiff to move to a new position within the company so that he would not be terminated. Vieth needed a project manager in the engineering department, and Andrews knew that Plaintiff's position was in danger. Andrews thought that with Plaintiff's background and work experience in engineering, this position might be a good fit for him. Andrews decided to approach Plaintiff with this idea, even though the engineering position was not a management-level position and was classified at a lower grade than Plaintiff's job in the Quality Department.

During that meeting, Andrews gave Plaintiff "mixed performance feedback," stating both negative and positive things about Plaintiff. Andrews suggested that Plaintiff meet with Bill Veith, the engineering department manager. Andrews also alluded to a potential restructuring within TEC. Plaintiff left the meeting confused and concerned about his job security.

On October 9, 2016, Plaintiff sent an email to Brenda Gilman, a human resources representative, stating that Andrews had told him that his position was going to be affected by an upcoming restructuring and asking what he should do. Gilman forwarded Plaintiff's email to Andrews, who responded to Plaintiff, telling him that his conclusions about his position being affected by a restructuring were "incorrect and premature."

Plaintiff believed that moving to the engineering position would be a demotion, even though his salary would remain unchanged. On October 24, 2016, Gilman reached out to Andrews and inquired whether Plaintiff had discussed the engineering position with Veith. Andrews responded that Plaintiff needed to be on the RIF list, and it was up to Veith to make Plaintiff a job offer in the engineering department before Plaintiff was scheduled to be let go. In late October, Plaintiff met with Vieth and declined the position in the engineering department.

TEC's RIF happened in several waves, or stages. Each employee whose name was on the list was assigned a date on which he or she would be notified of termination. TEC originally scheduled Plaintiff's termination for November 11, 2016. On November 10, Ananthan emailed Beistline and told her that he had heard "from the grapevine" that Plaintiff was planning to resign from his position at TEC.[1] Anthanan asked Beistline to postpone Plaintiff's termination date, and Beistline moved Plaintiff's termination date from November 2016 to early 2017. TEC then scheduled Plaintiff to be notified of his upcoming termination on January 20, 2017, with an effective termination date of February 3, 2017.

On December 5, 2016, however, Plaintiff suffered a seizure at work and was taken to the hospital by ambulance. Plaintiff took concurrent short-term disability leave and leave under the

---

[1] Plaintiff had started interviewing for other jobs and he had shared this fact with his coworker and friend, Kevin Ankrum.

Family and Medical Leave Act ("FMLA") and the Oregon Family Leave Act ("OFLA") through January 4, 2017. Plaintiff later extended his approved short-term disability leave through March 24, 2017. (Plaintiff's FMLA and OFLA benefits expired on February 27, 2017.) TEC further delayed Plaintiff's scheduled RIF date due to his medical leave.

## C. FDA Inspection in September 2016

TEC is an FDA registered contract manufacturer of medical device components. On September 8, 2016, McCabe learned that there would be an FDA inspection at TEC's Wilsonville facility. McCabe flew to Wilsonville to prepare for that inspection. Preparations for the FDA inspection began on September 10, 2016, and the inspection began on September 13, 2016. Plaintiff and Kevin Ankrum, among others, assisted McCabe in preparing for the FDA inspection.

On September 10, 2016, three days before the inspection began, Plaintiff was working at the Wilsonville facility with Ankrum and McCabe. Plaintiff and McCabe reviewed an internal audit and Corrective Action Preventative Action ("CAPA") that Plaintiff, Ankrum, and Troy Brewster, another TEC employee, had prepared. McCabe asked to see previous versions of the global internal audit schedule, but Plaintiff reported that they were not in the records. McCabe reviewed the existing global internal audit schedule and began to make handwritten changes to the document. McCabe also instructed Plaintiff to make these changes and then reprint the front page of the document.

In response to McCabe's request, Plaintiff showed "immediate discomfort." Plaintiff believed that McCabe was requesting falsification and backdating of a record and further believed that the changes to the document should have reflected the current date, not the date that Plaintiff had originally completed and signed the record. Plaintiff told McCabe something to the effect of "this doesn't feel right." McCabe replied, "Well, Chris, you're the only approval

required so they shouldn't be hard to find." McCabe then "winked" and "smiled" at Plaintiff. Plaintiff concluded that McCabe's wink indicated that she knew that he was opposed to her request.[2] Ultimately, Plaintiff did not revise, reprint, or sign the document as requested. On September 13, 2016, when the FDA inspector asked to review the global audit schedule, Plaintiff presented the original schedule to the inspector. McCabe was present when Plaintiff did this and, thus, presumably knew that he had not complied with her request.

Also on September 10, 2016, McCabe and Plaintiff were reviewing each individual open CAPA, and McCabe identified a CAPA initiated by an overdue preventative maintenance for equipment relating to environmental control systems for the facility. McCabe instructed Plaintiff that "an assessment was needed to state [that] an initial review determined there was no impact to systems in control of product quality." That same day, McCabe reviewed TEC's quality manual and complaints procedure. During her review, McCabe identified obsolete references to medical device reporting. Plaintiff explained that he had removed some of the references from the quality manual because he had been instructed to do so by Sears, his previous supervisor. Plaintiff also explained that the remaining references were in the document because Sears had instructed him to update the quality agreements with customers before revising the procedures.

In further preparation for the inspection, on September 10, 2016, McCabe reviewed an internal audit report that Plaintiff had completed under the supervision of Sears. Plaintiff had initiated the internal audit because he recognized that TEC had deficiencies in the area of training, although Plaintiff believed that he could not have been responsible for the failures identified in the training audit because he had not been working at TEC during the time period

---

[2] McCabe testified at deposition that she was completely unaware that Plaintiff had any concerns during the preparation for the FDA inspection or during the FDA inspection. That is a disputed fact that the Court resolves in favor of Plaintiff at this stage of the litigation.

during in which the failures had developed. After reviewing the training audit report, McCabe sent an email to Plaintiff and Ankrum in which she described the training audit report as "scathing" and expressed her displeasure with the report.

On September 10, 2016, at 8:20 p.m., McCabe sent an email to Andrews, expressing her disappointment with Plaintiff's work. In her email, McCabe wrote, "[a]fter a day of diving into the QMS [Quality Management Systems] aspects it is extremely clear that Chris L[inggi] is in his job and way over his head. He is very committed but *has no clue how to protect us* and in fact [I] feel is more a risk than a [*sic*] asset. . . . Anyway – just want to give you a heads up. We'll get through the next week but [I] think we need to make changes later." ECF 41-1 at 54 (emphasis added); ECF 30-2 at 22 (same document). Andrews responded the following day, saying "I'm leaning toward similar thoughts." *Id.*

Also on September 10, 2016, after Plaintiff finished preparations for the audit for the day, Plaintiff reached out to his former supervisor, Jeff Sears, who no longer worked for TEC. Plaintiff had serious concerns about McCabe's conduct that day and believed that her actions amounted to violations of federal or state law, FDA regulations, or TEC policies. Plaintiff contacted Sears and described to him McCabe's instruction to modify the internal audit report. Sears agreed that this action sounded unlawful. Sears advised Plaintiff to take notes regarding his concerns, escalate his concerns, and ask simple questions like "is this okay" and "help me understand." Beginning September 11, 2016, Plaintiff began taking notes about the audit preparations.

On September 11, 2016, McCabe followed up with Plaintiff about the training audit report. She requested a redaction of the conclusion in the report that TEC suffered from a "lack of active management and leadership commitment." ECF 39 at 6. Plaintiff complied and

redacted that statement with a marker, but McCabe clarified that she wanted him to remove the entire first page of the document. Plaintiff responded, "The report is a controlled document." *Id.* Plaintiff believes that when he stated that the report is a controlled document, McCabe understood that he was advising her that the report could not be modified. Plaintiff believed that McCabe's request did not comply with the regulations governing controlled documents and records.

Also on September 11, 2016, McCabe also followed up with Plaintiff about the quality manual and complaints procedure and asked Plaintiff to remove the obsolete references in the quality manual and complaints procedure. Plaintiff pushed back on her request, explaining that he was in the process of reviewing the customer quality agreements. Plaintiff believed that those agreements needed to be updated before he could update the quality manual and complaints procedure. Plaintiff voiced his concerns, but McCabe dismissed those concerns and required Plaintiff to update the complaints procedure. Plaintiff complied with her request but believed that updating the procedure that way was also illegal.

On September 12, 2016, Plaintiff followed up on a request from McCabe for a CAPA assessment. Plaintiff consulted with the facilities manager, Ray Edwards, and a quality engineer, Kirsten King, and both agreed that the assessment would need to be performed by the external vendor, and TEC did not have the qualified personnel on site. McCabe stated that this was not important and believed that a memo stating that the assessment had been completed with the requested conclusion would be sufficient. Plaintiff asked if this request was "okay" because he believed it to be unlawful. Plaintiff repeated that the facilities manager and quality engineer had believed this assessment was not possible.. McCabe dismissed Plaintiff's concern and asked him to write and sign "a simple paragraph memo of the completed assessment." ECF 39 at 8. The

next day, September 13, Plaintiff decided that the request was illegal and decided not to fulfill McCabe's request.

Also on September 12, Plaintiff reviewed a list of site product listings, and he notified Andrews that he believed the list was inaccurate because some products, including those requiring a Unique Device Identifier ("UDI") that had been in production for more than six months, were not included on the list. Plaintiff stated that there was a discrepancy in the listings. Plaintiff also notified McCabe that a new product existed and had been manufactured in the last six months but was not on the list. Plaintiff believed that it was necessary to disclose to the FDA all products actively being manufactured, and he told McCabe and Andrews that they should add another listing, so as to not omit information. McCabe dismissed plaintiff's statements.

Further, on September 12, 2016, McCabe announced that the team preparing for the audit should treat tubing "like its [sic] not in the room." ECF 39 at 10. Plaintiff told McCabe that TEC needed to disclose to the FDA that TEC was manufacturing tubing. McCabe dismissed Plaintiff's concern.

The FDA inspection formally began on September 13, 2016. McCabe was in a room with the FDA inspector, and Plaintiff, Ankrum, and others were in a "war room" nearby and electronically connected to McCabe by Instant Messenger. On that day, the FDA inspector asked whether there were any products at the Wilsonville facility requiring a UDI. McCabe told the inspector, "no." Plaintiff expressed his concern to Andrews that the information was inaccurate because a UDI product had in fact been manufactured in the last six months. Andrews dismissed Plaintiff's concern, telling him that he was making too big of a deal out of this. Plaintiff then approached McCabe and reminded her that the UDI product had been manufactured within the last six months. McCabe responded that they should move forward without addressing this

concern. On September 16, Plaintiff reiterated to Andrews that he was worried that TEC was not disclosing a UDI product that it had recently manufactured.

Also on September 13, the FDA inspector requested job descriptions of individuals in management. As the job descriptions were being prepared, it became clear that some descriptions were signed and dated and some others were not. Plaintiff overheard McCabe telling an employee to copy and scan her job description several times so that it would "look older." ECF 39 at 11. After work ended on September 13, Plaintiff and Ankrum had dinner together and Plaintiff told Anrkum, "this is so illegal." *Id.*

On September 15, still during the FDA inspection, the inspector was reviewing supplier controls, supplier records, and TEC's adherence to procedures for supplier management. During this review, the inspector requested to review the long-form assessment and file for Plitek, a TEC vendor. Vishnu Venkatasen, who was working on the inspection, and Plaintiff began contacting procurement team members who could locate the file. Plaintiff contacted the buyer on site who located the file, printed it, and showed it to Plaintiff, but the assessment form was blank. According to Plaintiff, the assessment form should have been completed before Plitek could be an approved vendor. Someone communicated to McCabe that this form was blank, and McCabe sent an email to Plaintiff and Venkatasen asking if someone could complete and sign the form. Plaintiff saw the email and told Venkatesen, "I can't." McCabe came into the war room where Plaintiff was working and asked about the Plitek form. Plaintiff responded, "I can't" and turned away. ECF 39 at 12; ECF 30-1 at 49.

Plaintiff believed there was intentional misleading of the FDA inspector and that this was fraudulent and unlawful. Venkatasen and Andrews continued to work to support McCabe's request to get the form filled out and enlisted an engineer, Katherine Ladwig, to fill out the form.

Plaintiff printed out a copy of the procedure that the form should have followed and gave it to Andrews. Plaintiff told Andrews, "you need to understand what you're doing. The procedure requirements of this form are different from when it was added to the [approved vendor list]. The procedure requirements today are different." ECF 39 at 13. Andrews ignored Plaintiff's statements, but, unlike McCabe, recognized at the time that Plaintiff had concerns. ECF 40-1 at 55. Ladwig filled out the form and sent it to McCabe, but McCabe entered the war room several minutes later and announced, "You might as well have put today's date on the front page" and instructed Ladwig to fill out the form again. ECF 39 at 13. Plaintiff did not participate in any supporting actions for the form to be modified again, and he refused to participate in the "group chat" regarding the form. At the end of the day, Plaintiff told Andrews, "Mark, what happened today was very very wrong." ECF 39 at 14. Plaintiff told Andrews that "there are CFR requirements that must be met, and a supplier evaluation is one of them." *Id.* Andrews dismissed Plaintiff's concern.

On September 16, 2016, after the FDA inspection was over, Plaintiff heard from his friend Ankrum that McCabe had told Ankrum that "Chris has got to go." ECF 39 at 15. On September 16, Plaintiff texted Jonathan Perez, a coworker at TEC, telling him that McCabe "deliberately and intentionally asked people to fabricate records" and "The VP fabricated documents . . . She submitted fake evidence on purpose." Stark Decl. Ex. 11. Plaintiff expressed that, "I'm going to lose my job over this." Stark Decl. Ex. 11.[3]

---

[3] Defendant objects to the admissibility of the screen shots of the text messages because they were disclosed late, cannot be authenticated, and are hearsay. Plaintiff concedes that the messages were disclosed late due to an error, and states that Plaintiff himself can authenticate the images. Plaintiff has also provided to Defendant the mobile phone that the messages were sent from, and Defendant sent it to a third party specialist to try to recover the messages. At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony."

After the FDA inspection was over, McCabe awarded spot bonuses to the individuals who helped with the inspection. McCabe recommended to Vish Ananthan, the senior director and general manager of TEC, that Plaintiff receive a low spot bonus of only $250. In her email to Ananthan, McCabe explained that she "included Chris Linggi because he has done huge hours but he is the cause of a lot of our issues—but its because he is in a job he hasn't the experience or knowledge of." ECF 30-2 at 29. Anthanan responded and approved the spot bonuses but also told McCabe that some of the people on the list to receive bonuses were also on the restructuring list. This was the first McCabe learned that Plaintiff was on the RIF list. Ananthan explained to McCabe that Plaintiff might be moving out of the Quality Department and into a role in the Engineering Department. McCabe was supportive of this move, writing to Ananthan that she believed Plaintiff "could work out in [an engineering] role." ECF 30-2 at 30. After McCabe learned that Plaintiff was on the RIF list and that there were tentative plans to move him to a role in engineering, McCabe repeatedly followed up with Ananthan about when Plaintiff would be changing roles. ECF 41-1 at 60, 61, 63. Neither Plaintiff nor anyone else involved in the FDA inspection ever approached Beistline with any concerns about improper conduct during the inspection. ECF 32 at 7.

Plaintiff struggled with whether to report the events that transpired during the FDA inspection that he believed were unlawful. On October 7, after Plaintiff's meeting with Andrews when Andrews had mentioned restructuring and encouraged Plaintiff to transition to a position in

---

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). At trial, Plaintiff will have to present this evidence in an admissible form. Defendant also asks that the declaration of Ray Edwards be excluded under Rule 37(c) because it was not timely disclosed under Rule 25(a) or (e). Because Defendant concedes that the evidence is not material, the Court concludes that a sanction prohibiting Plaintiff from relying on the Edwards declaration is not necessary.

engineering, Plaintiff called a colleague in the Harrisburg, Pennsylvania office of TEC to report the incident of the Plitek supplier file. This colleague forwarded his concerns to Alicia Zonetti, the Assistant General Counsel for TEC, who contacted Plaintiff on October 11.

Plaintiff told Zonetti about his concerns regarding the Plitek form and an additional concern about a slide presentation that had been revised improperly before it was presented to the FDA inspector. Plaintiff also requested to remain anonymous, and to register his concerns as an anonymous complaint. On October 17, 2016, Zonetti reported Plaintiff's concerns to in-house legal counsel in the Office of the Ombudsman for investigation, who in turn hired outside counsel from the law firm Morgan, Lewis, & Bockius to assist. ECF 30-1 at 171-72. On November 22, the Office of Ombudsman issued a finding that the alleged wrongdoing was unsubstantiated. ECF 30-1 at 172. Plaintiff was not contacted during the investigation, though McCabe and Ankrum were asked to provide documents from the FDA inspection. Although McCabe and Ankrum were aware that a complaint had been made, both testified that they did not know that Plaintiff had made it. ECF 30-1 at 140-41, 177.

McCabe continued to take issue with Plaintiff's job performance. On September 18, 2016, she emailed Plaintiff asking that he send her whatever information he had on a "pareto of complaint root causes." ECF 45 at 15. Nine days later, McCabe followed up with Plaintiff, having never received a response, and she copied Andrews. *Id.* Plaintiff responded that he would send her the requested information by the close of business on September 28. When McCabe had not received anything by October 3, 2016, she again informed Andrews, "giving [him] a heads up that [she] still didn't get this." *Id.* On October 3, McCabe followed up directly with Plaintiff, asking if he was going to send the information soon. On October 6, 2016, Plaintiff responded,

promising to send the information by October 10. On October 11, McCabe forwarded the entire email thread to Andrews with the comment "still no sign of this." ECF 45 at 13.

On October 11, 2016 McCabe sent an email to Andrews with the subject line, "Chris's lack of knowledge of Quality Systems," describing the biggest issues she had with Plaintiff, including that he lacked even a basic understanding of internal audits. She also stated that Plaintiff was "without exception the least reliable person" she had ever worked with. ECF 34-1 at 1. Additionally, Plaintiff missed an October 11 deadline for completing performance evaluations of employees who reported to him. Plaintiff left for vacation on October 11, and in his absence Andrews and Brenda Gilman from the human resources department had to complete the performance evaluations instead. ECF 30-2 at 10-11.

On Plaintiff's year-end performance review, given to him by Andrews on December 1, 2016, Plaintiff received "meets TE expectations" in nearly every performance objective except for his "behavior" rating. Andrews explained that Plaintiff "often did not deliver on commitments to requests by senior leadership and assigned blame on others in a manner that was both unprofessional and unproductive." ECF 41-1 at 81. Additionally, Andrews highlighted the fact that Plaintiff "did not produce a comprehensive development and hiring plan for his team . . . and failed to complete their performance reviews prior to being on vacation and having the system lock." ECF 41-1 at 81.

On December 1, 2016, Plaintiff made a second complaint about misconduct during the FDA inspection, this time by filing a complaint through TEC's internal "ConcernLine" complaint system. This complaint was not made anonymously. The local Human Resources representative Brenda Gilman was assigned to investigate this complaint. She was unable to interview Plaintiff as part of the investigation because by that point he had already suffered his

seizure and was on medical leave. Gilman, however, interviewed Andrews and Ankrum. Gilman

attempted to interview Plaintiff, but by then he had already retained legal counsel who had

instructed TEC not to contact Plaintiff.

## D. TEC's Termination of Plaintiff's Employment in March 2017

In January 2017, Ananthan implemented a plan to hire a senior-level manager to take

over the Quality Department and restructure and reorganize that department. The reorganization

of the Quality Department took effect in January 2017, while Plaintiff was still on medical leave.

Ananthan hired Larry Rhodes as head of Global Quality for Surgical and Cables, and Rhodes

reported directly to McCabe. On January 26, Ananthan issued a company-wide announcement of

the reorganization of the Quality Department, including what he characterized as "a makeshift

role" for Plaintiff, albeit a much diminished one. Ananthan described Plaintiff's position as

having been eliminated in the reorganization. Beistline also characterized the "new Quality

Organization" as having "eliminated" Plaintiff's previous role.

In early March 2017, Beistline decided that Plaintiff should be transferred to the

engineering department rather than terminated and that if Plaintiff did not want to work in the

engineering department because he was unwilling to accept a downgrade in status he could

resign. After discussing this with Anthanan, Beistline changed her mind about her plan for

Plaintiff and determined that continuing with the original plan of terminating Plaintiff through

the RIF was the best option. Beistline concluded that there was not a position in engineering that

Plaintiff would accept, as Plaintiff had made clear that he would not accept a downgrade in status

or a non-managerial position. On March 6, 2017, Beistline emailed Ananthan about Plaintiff's

status. Because Plaintiff was on a protected leave of absence, Beistline had reviewed the

scheduled changes to Plaintiff's employment status with labor and employment counsel. In the

email, Beistline expressed that it was still possible for Plaintiff to move into the engineering

position, but she also noted that his current position (or, at that point, prior position, as he had been on a leave of absence for three months) had been eliminated in the restructuring.

After sending the email to Ananthan on March 6, 2017, Beistline and Ananthan had a telephone conversation in which they agreed that continuing with the RIF was the best course of action. Beistline did not consult with McCabe or Andrews regarding any of her decisions and recommendations to Ananthan regarding Plaintiff's inclusion on the RIF list at any time. On March 17, 2017, TEC terminated Plaintiff's employment and provided him with a severance package.

## DISCUSSION

### A. Statutory Retaliation Claims

The Ninth Circuit has cautioned that there are "countervailing concerns" in the field of workplace retaliation. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint[,] . . . making such a complaint tantamount to a 'get out of jail free card' for employees." *Id.* "On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions." *Id.* Thus, courts try to strike a balance between protecting employees who engage in protected activity and permitting employers to make unbiased business decisions involving employees who have engaged in protected activity.

At the summary judgment stage, courts apply the *McDonnell Douglas* burden-shifting analysis, even to state law claims. *See Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001) (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012) (applying burden-shifting framework to a claim alleged under Or. Rev. Stat. § 659A.199). This

analysis follows three steps. First, a plaintiff must establish a *prima facie* case of retaliation. If the plaintiff can establish a *prima facie* case, then the defendant, the employer, "must articulate a legitimate, nondiscriminatory reason for the challenged action[s]." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088-89 (9th Cir. 2008). Lastly, if the defendant "satisfies this burden," the plaintiff "must show that the 'reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). Although the timing of an adverse employment action can provide strong evidence of retaliation, "timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1070 (9th Cir. 2003).

"To establish a *prima facie* case of retaliation under Oregon Revised Statutes § 659A.199 . . . [a] [p]laintiff must show (1) she was engaging in a protected activity, (2) she suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." *Larmanger*, 895 F. Supp. 2d at 1049 (internal quotation marks and citation omitted) (italics added). "The requisite degree of proof necessary to establish a *prima facie* case [of retaliation] . . . is minimal and does not even need to rise to the level of a preponderance of the evidence." *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1242 (D. Or. 2015) (citation omitted).

Under Oregon law, as under federal law, a plaintiff "must establish a 'causal connection' between a protected activity and the discharge." *Estes v. Lewis and Clark College*, 152 Or. App. 372, 381 (1998) (quoting *Shockey v. City of Portland*, 313 Or. 414, 423 (1992)). A "causal connection" means that "the employee's protected activity [was] a substantial factor in the

motivation" for the adverse employment action. *Id.* at. 381. "[T]he employer's wrongful purpose must have been a factor that made the difference in the . . . [employer's] decision." *Id.* This causal connection can be demonstrated through "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Plaintiff focuses on two adverse employment actions that he alleges were retaliatory in nature: his termination in March of 2017 and his performance review in December of 2016. Plaintiff commenced this lawsuit on November 6, 2017, and so any adverse employments actions occurring before November 6, 2016 are barred by the one-year statute of limitations. *See* Or. Rev. Stat. § 659A.875.

**1. Plaintiff's Termination**

**a. Prima Facie Case**

Plaintiff asserts that he engaged in protected activity between September 10 and September 16, 2016, during the FDA inspection at TEC and TEC's related preparation for that inspection. TEC disputes this assertion. Viewing the facts in the light most favorable to the nonmoving party, the Court concludes that the questions asked and the actions taken by Plaintiff between September 10 and September 16 constitutes protected activity, or at least raises a genuine issue for trial. Further, during the evening of September 10, after Plaintiff raised his first concerns with McCabe (to whom Plaintiff reported in a "dotted line" relationship), McCabe sent an email to Andrews (to whom Plaintiff directly reported), stating, among other things, that Plaintiff "has no clue how to protect us" and is "more a risk" than an "asset." On or about September 16, McCabe told Ankrum (who also participated in the FDA inspection) that Plaintiff "has got to go."

Plaintiff also engaged in protected activity on October 7, 2016, when he filed a formal complaint with TEC. Two days later, on October 9, Plaintiff asked TEC's human resources department whether Plaintiff was going to be affected by the upcoming restructuring. Andrews responded by telling Plaintiff that his conclusions about his position being affected by a restructuring were "incorrect and premature." For purposes of summary judgment, the Court draws all reasonable inferences in the light most favorable to the nonmoving party and concludes that Andrews was telling Plaintiff that no final decision had been made to terminate Plaintiff's employment. Indeed, in October 2016, TEC was still considering whether to transfer Plaintiff to TEC's engineering department, rather than terminating his employment. Also, in November, the proposed RIF termination date for Plaintiff was again postponed.

Plaintiff engaged in another protected activity on December 1, 2016. Three months later, in early March 2017, Beistline (with TEC's human resources department) decided that Plaintiff should be transferred to the engineering department, rather than terminated. Nevertheless, after Beistline spoke with Ananthan later that month, TEC terminated Plaintiff's employment on March 17, 2017.

The Ninth Circuit has held that, under Title VII, "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). McCabe states that she did not know that Plaintiff had any concerns during the FDA inspection because his statements were ambiguous. Plaintiff responds that McCabe understood that he was engaging in whistleblowing activity during the audit. Viewing all reasonable inferences in favor of the nonmoving party, this dispute presents a genuine issue of fact for the jury. Plaintiff suffered an adverse employment action on

March 17, 2017, when TEC terminated his employment. Further, this occurred within the limitations period. Thus, Plaintiff has shown a *prima facie* case of unlawful retaliation.

### b. Pretext

"The next step in the *McDonnell Douglas* framework requires the employer to give legitimate non-[retaliatory] reasons" for the adverse employment action. *Davis*, 520 F.3d at 1091. Defendant argues that it did not terminate Plaintiff because of his protected activity, but instead terminated him in the course of a previously scheduled RIF. Defendant maintains that it had a legitimate, lawful, reason for terminating Plaintiff—because his name was on the RIF list—and that it had a legitimate, lawful reason for placing Plaintiff's name on the RIF list because Plaintiff's role was in flux and greatly diminished and he was one of the highest paid employees.

On July 14, 2016, Andrews recommended that Plaintiff's name be placed on the list of potential RIF candidates, but also noted the possibility that Plaintiff might be transferred to another position, not terminated outright. Plaintiff's name remained on the RIF list when Beistline sent an email on July 17, attaching the list of employees who had been suggested for inclusion in the RIF. As previously discussed, Plaintiff first engaged in protected activity between September 10 and September 16. TEC argues that Beistline had no knowledge of Plaintiff's protected activity and was unaware of the events concerning the FDA audit when she sent another email with Plaintiff's name on the RIF list on September 13. TEC also argues that TEC's corporate and legal departments had no knowledge of Plaintiff's protected activity.

"Employers need not suspend previously planned" employment actions upon learning that an employee made a protected complaint, "and their proceeding along lines previously contemplated, though not definitely determined, is no evidence whatever of causality." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). TEC argues that it proceeded "along

lines previously contemplated, though not definitively determined" when it terminated Plaintiff's employment in March 2017. TEC further argues that a decision to include an employee in a reduction in force can be a legitimate, lawful explanation for an employee's termination, as long as the employer has an individualized explanation for why that employee was included in the reduction in force. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1212 (9th Cir. 2008). "To meet its burden, the employer must explain why it selected the plaintiff in particular for the layoff." *Davis*, 520 F.3d at 1094. In *Diaz*, the Ninth Circuit concluded that an employer's concerns about damage caused to company property provided an individualized, legitimate, non-discriminatory reason for including two employees in a reduction in force, but simply stating that an employee was terminated pursuant to a reduction in force was insufficient to establish a lawful reason for the employer's actions. *Diaz*, 521 F.3d at 1212.

According to TEC, Andrews gave specific, individualized reasons for Plaintiff's inclusion on the RIF list, including that Plaintiff was one of the highest paid employees and his role at TEC was in flux and had shrunk in scope. Further, when Plaintiff began working in the Quality Department in November 2015, he supervised five employees. By the summer of 2016, that number had been reduced to three. Additionally, Andrews explained that Plaintiff's role was one that the company could do without because Plaintiff's position was redundant with the on-site quality manger role. TEC maintains that these legitimate reasons for including Plaintiff's name on the RIF list all pre-date any protected activity by Plaintiff. Thus, argues TEC, Plaintiff's protected activity, beginning in September 2016, could not have contributed to Andrews' decision to place Plaintiff's name on the RIF list in July 2016. TEC concludes that it has articulated a legitimate, nonretaliatory explanation for Plaintiff's termination.

Employers need not deviate from a previously planned course of action just because an employee later engages in protected activity. *See Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1051 (D. Or. 2012). In *Larmanger*, the plaintiff's supervisor had drafted a corrective action against the plaintiff in December 2008, the plaintiff made a protected hotline complaint in February 2009, and the plaintiff received the corrective action in June 2009. *Id.* Therefore, although the plaintiff in *Larmanger* did receive a corrective action after she made a protected complaint, "it had already been decided" that the plaintiff would receive the corrective action before she engaged in protected conduct, and therefore the corrective action could not have been retaliatory. *Id.* "An employer who has decided upon a new policy is not guilty of unlawful retaliation simply because it proceeds with the implementation of that policy after learning that one of the employees who will be affected thereby has recently engaged in a protected activity." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982); *see also Huitt v. Optum Health Servs.*, 216 F. Supp. 3d 1179, 1193 (D. Or. 2016) (finding that because employer's decision to remove Plaintiff from Admin post came before Plaintiff made report of unlawful conduct, "Plaintiff has not established a causal connection").

TEC's RIF list, however, was an evolving document. If an employee retired or resigned, a name might be removed from the list. Although Plaintiff's inclusion on the RIF list was first set in motion in July 2016, Plaintiff was not actually terminated until March 17, 2017, *after* he engaged in protected activities. Further, in October 2016, Andrews met with Plaintiff and encouraged him to take a position in the engineering department with Bill Veith, and Vieth offered Plaintiff a job in that department. Similarly, Ananthan and Beistline postponed Plaintiff's scheduled termination in November 2016. These actions show that it was not a forgone conclusion that TEC would terminate Plaintiff's employment.

Indeed, in March of 2017, shortly before Plaintiff was terminated, Beistline again proposed transferring Plaintiff to the engineering department instead of terminating him. Therefore, although the Supreme Court has recognized that "proceeding along lines previously contemplated, though not definitely determined, is no evidence whatsoever of causality," the decision to terminate Plaintiff was not only not definitively determined, but twice was nearly averted.[4] *Breeden*, 532 U.S. at 272.

Plaintiff adds that the RIF list was not set in stone for many employees, and many individuals whose names were on the RIF list were not ultimately terminated. Beistline described the RIF list as "pretty dynamic" and stated that "until people walk out the door nothing is ever final." ECF 30-1 at 106. Not including Plaintiff, at least 15 people on the original RIF list (of the names not redacted) had not been terminated by February 2017. *See* Pl.'s Ex. 34 (ECF 41-1 at 102). Thus, there is a genuine dispute of fact as to how firm or fixed the RIF list was and how previously planned the proposed terminations actually were. In light of the dynamic and evolving nature of the RIF list, and the fact that on three occasions TEC deviated from the previously planned action of terminating Plaintiff, the Court concludes that a jury must decide whether the RIF was a legitimate, nonretaliatory reason for Plaintiff's discharge or whether the RIF was a pretext for a retaliatory motive.

### c. Causation

Plaintiff asserts a theory of "cat's paw" causation. He argues that McCabe disparaged him to Ananthan, who was the ultimate decisionmaker responsible for Plaintiff's termination,

---

[4] TEC argues that Plaintiff has pointed to no evidence that TEC ever intended to keep Plaintiff in his position as a Quality Systems Manager, but the decision to eliminate Plaintiff's position does not equate to a decision to terminate Plaintiff's employment, as is evidenced by the fact that TEC considered eliminating Plaintiff's position yet transferring him to engineering rather than terminating his employment altogether.

and in doing so influenced Ananthan's decision to terminate Plaintiff. Under the "cat's paw" theory:

> if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007); *see Osanna v. Nike, Inc.*, 290 Or. App. 16, 30-31 (2018) (recognizing that *Poland*'s "articulation of the imputation of the subordinate bias theory" applies to Oregon whistleblowing claims).

On September 15, McCabe emailed Ananthan about awarding spot bonuses to employees who helped out during the FDA inspection. ECF 41-1 at 56. McCabe proposed giving a bonus to Plaintiff, but stated that "he is a cause of a lot of our issues—but its [sic] because he is in a job he hasn't the experience or knowledge of." *Id.* Later, McCabe wavered on whether Plaintiff should get a bonus, stating that "I cannot justify giving him a financial reward." *Id.* at 61. After McCabe learned that Plaintiff was going to be leaving his role in the Quality Department, and possibly moving to engineering, McCabe followed up repeatedly with Ananthan on the progress of Plaintiff's transition. On September 20, McCabe wrote, "I want to chat to you on Chris L and next steps to move him on . . . I just want to start the conversation. You heard Paraic— *Quality is too high a risk for our business*. Also, I have completely changed my mind on including [Plaintiff] in the recognition—its [sic] sending the wrong message when he isn't performing." *Id.* at 63 (emphasis added). On September 22, she again followed up with Ananthan on "[n]ext steps on moving Chris Linggi to Bill Vieth's org . . . so I can start to a recruit a new senior QE for the QMS position (Chris's backfill)?" *Id.* at 61. If McCabe's criticisms of Plaintiff influenced Ananthan's perception of Plaintiff as a bad employee, or a risk to the company, then Ananthan

might have been more inclined to terminate Plaintiff rather than keep him within the company. And, although Beistline says that she was the one who convinced Ananthan to terminate Plaintiff, Ananthan was the ultimate decisionmaker.[5]

Defendant argues that a cat's paw theory cannot apply to Plaintiff's claims here because neither Ananthan nor Beistline made RIF decisions in response to a proceeding set in motion by Andrews or Mccabe. Because Plaintiff's name was first placed on the RIF list in July 2016, Defendant argues, McCabe and Andrews could not have set in motion adverse employment actions against Plaintiff. But, as discussed above, the RIF list was far from final in July 2016, and in both October 2016 and March 2017 there were serious plans to not terminate Plaintiff and instead move him to the engineering department. As late as March 2017, just days before Plaintiff's termination, Beistline recommended that Ananthan give Plaintiff the option to move to the engineering department. ECF 32-1 at 22; ECF 30-1 at 110-11.

Defendant argues that there is no evidence that McCabe ever influenced Ananthan regarding Plaintiff. Defendant argues that this case is like *Cafasso v. General Dynamics C4 Systems, Inc.*, where the Ninth Circuit found that a "cryptic statement" that perhaps the supervisor had been influenced by unknown "people" who had "poisoned the water" for the plaintiff was insufficient to survive summary judgment on a cat's paw theory of liability. 637 F.3d 1047, 1061 (9th Cir. 2011). In *Cafasso*, the Ninth Circuit concluded that, although the chain of influence from subordinates to the decision maker "could conceivably have occurred, it [did] not give rise to a reasonable inference that it did in fact occur." *Id.*

---

[5] Additionally, at this point, Plaintiff had made his December 1 complaint, which was not anonymous, and Brenda Gilman, in the same human resources office as Beistline, had begun a formal investigation and was attempting to interview Plaintiff. ECF 30-2 at 24.

The evidence in this record, however, shows that McCabe emailed Ananthan multiple times to discuss Plaintiff in a highly critical manner. Although Defendant urges the Court to read the emails in an uncritical light, at this stage the Court draws all reasonable inferences in favor of Plaintiff. Plaintiff has set forth "non-speculative evidence of specific facts" that McCabe communicated with Ananthan about Plaintiff's job performance in a negative manner. *Id*. If, when considering whether to transfer Plaintiff or terminate him, Ananthan was influenced by McCabe's criticisms of Plaintiff, his job performance, and whether he was a risk to the company, there is a fact dispute whether a "biased subordinate" might have influenced the decisionmaker. *Poland*, 494 F.3d at 1182. Whether McCabe's criticisms were caused by retaliatory animus and whether those criticisms ultimately influenced Ananthan to terminate Plaintiff rather than transfer him are questions for the jury.

### 2. Plaintiff's Performance Review

"[A]n undeserved negative performance review can constitute an adverse employment decision." *Brooks*, 229 F.3d at 929. To constitute a retaliatory adverse employment action, however, the performance review must not only be *undeserved*, but it must be causally connected, like any other adverse employment action in a retaliation case, to the employee's protected activity. It is not this Court's job to determine whether the negative performance review was "wise, fair, or even correct" so long as the performance review was not motivated by retaliatory animus. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 2754, 279 (9th Cir. 2000). TEC offers a legitimate, non-retaliatory explanation for its actions.

On December 1, 2016, Andrews met with Plaintiff to deliver his annual performance review. Plaintiff received a rating of "meets TEC expectations" in every category on his review except one, TE Values and SET (Strategy, Execution, Talent) Behaviors. Plaintiff alleges that his rating of "Below TE Standards" in this category was in retaliation for his protected activity. In

the notes explaining why Plaintiff was receiving a below standards rating in that category, Andrews wrote that "Chris often did not deliver on commitments to requests by senior leadership and assigned blame on others in a manner that was both unprofessional and unproductive. . . . Chris did not produce a comprehensive development and hiring plan for his team to provide a roadmap to success and failed to complete their performance reviews prior to being on vacation." ECF 30-2 at 6.

This performance review implicitly refers to Plaintiff's failure to provide McCabe with a "pareto of root causes" for several weeks after she asked for it. ECF 45 at 5. McCabe initially requested this work from Plaintiff on September 18, but as of October 11, despite numerous follow up emails, Plaintiff had not yet provided it to her. In Plaintiff's declaration, he states that this criticism was unfair because McCabe did not provide any negative feedback on the report that he ultimately produced for her, but it is undisputed that he did not produce the report in a timely fashion. ECF 39 at 17 ("the project took much longer than expected"). During his deposition, Plaintiff recognized that "with the project for [McCabe, he] could have definitely improved [his] accountability to her." ECF 30-1 at 59. He stated that he "should have done a better job communicating the challenges" that he was facing to McCabe. ECF 30-1 at 58. Thus, although Plaintiff argues that the work he ultimately submitted did not receive any negative feedback, he does not dispute the fact that the work was not completed on the timeline McCabe had asked for. Plaintiff's negative performance review did not take issue with the quality or substance of his work, only with his ability to deliver it. When asked about the performance review's assessment that he assigned blame on others, Plaintiff responded by saying that many issues were the fault of his predecessor, "the person . . . that was removed in the organization earlier . . . I essentially had to fix all of her work. It wasn't a blame . . . I can see how maybe

blaming somebody, but, no, it was actually trying to get this." ECF 30-1 at 59. Although Plaintiff believed that many issues were, in fact, the fault of his predecessor and not his own fault, he does not dispute that he frequently attributed problems to her.

The performance review also mentioned Plaintiff's failure to complete the performance reviews for his staff before going on vacation. Plaintiff's performance reviews for his subordinates were due on October 11, but on October 18, Plaintiff's supervisor, Andrews, texted him asking why the ratings were not entered for Plaintiff's subordinates. ECF 43 at 3. Plaintiff told Andrews via text what his recommendations were going to be, but never entered his performance reviews into the system because Andrews and Ananthan did it while he was away. ECF 43 at 5. Although Plaintiff argues that he did in fact complete the performance reviews, Plaintiff concedes that he "misunderstood the due date" and failed to give the performance reviews to his supervisor before the deadline. ECF 39 at 18. In his deposition, he stated that he would "take accountability for not reading that part of it" leading to misunderstanding the deadlines. ECF 30-1 at 61. During his deposition, Plaintiff described this criticism as "fair, because . . . [t]here was a misunderstanding on [his] part on the timeline." ECF 30-1 at 60.

Plaintiff, thus, has failed to establish any genuine dispute of material fact as to the cause of the "Below TE Standards" rating in his performance review. Defendant has presented a legitimate, non-retaliatory reason for the review, and Plaintiff does not dispute the factual bases underlying the critiques or otherwise show that they are pretextual. Because Plaintiff has failed to rebut Defendant's legitimate reasons for the "below expectations" rating in the behavior category, Plaintiff has failed to prove a causal link between his protected activity and the negative performance review. *See Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (finding that the plaintiff failed to rebut legitimate reasons for adverse performance

memoranda when it was undisputed that the plaintiff engaged in the activities discussed in the memoranda). Thus, on this issue, TEC's alternative motion for partial summary judgment is granted.

## B. Or. Rev. Stat. § 659A.030(f)

Plaintiff also brings retaliation claims under Or. Rev. Stat. § 659A.030(f). This statute prohibits discharging, expelling, or otherwise discriminating against individuals who oppose an unlawful practice "under this chapter." That same statute, titled "Discrimination due to race, color, religion, sex, sexual orientation, national origin, marital status or age" outlines unlawful employment practices specifically in terms of discrimination against a protected class. *See Pool v. VanRheen*, 297 F.3d 889, 910 (9th Cir. 2002). Because Or. Rev. Stat. § 659A.199 prohibits whistleblower retaliation, Plaintiff argues, whistleblower retaliation is an unlawful practice "under this chapter," meaning under Chapter 659A, and therefore Or. Rev. Stat. § 659A.030(f) provides a cause of action for violations of Or. Rev. Stat. § 659A.199. But Plaintiff did not oppose whistleblower retaliation made unlawful under Chapter 659A of the Oregon Revised Statutes, he opposed what he believed to be violations of FDA regulations along with violations of unspecified state law or TEC policies. Plaintiff did not oppose a practice made unlawful under Chapter 659A. Additionally, Or. Rev. Stat. § 659A.199 already provides its own cause of action. "Therefore, if 659A.030(1)(f) provided a cause of action for violations of Section 659A.199, it would be redundant and unnecessary." *Bauer v. Old Dominion Freight Line, Inc.*, 2019 WL 339404, at *4 (D. Or. Jan. 28, 2019). "This further compels the Court's conclusion that 659A.030(1)(f) protects against discrimination based on a protected class and does not also encompass prohibitions on retaliation for whistleblowing [under] Section 659A.199." *Id.* Accordingly, Plaintiff's claims under Or. Rev. Stat. § 659A.030(f) are dismissed.

### C. Common Law Wrongful Discharge

"Under Oregon law, the common law remedy for wrongful discharge or termination is available only in the absence of an adequate statutory remedy." *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1145 (D. Or. 2013). In several cases decided in the District of Oregon, the district court has repeatedly held that Or. Rev. Stat. 659A.030 and 659A.199 provide an adequate statutory remedy to plaintiffs complaining of retaliation or discrimination in the workplace, precluding a common law wrongful discharge claim. *See, e.g.*, *Battan v. Allwest Underground, Inc.*, 2008 WL 4191467, at *4 (D. Or. Sept. 5, 2008). "This Court has previously found that a common law wrongful discharge claim provides the same remedies as a whistleblower retaliation claim under ORS § 659A.199 and that two claims cannot be pursued simultaneously when based upon the same conduct." *Luke v. Target Corp.*, 2018 WL 2144347, at *2 (D. Or. May 9, 2018). Although Plaintiff urges the Court to reconsider the prior decisions in this district, there is no basis to do so. Thus, on this issue as well, TEC's alternative motion for partial summary judgment is granted.

## CONCLUSION

Defendant's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment (ECF 29) is granted in part and denied in part. Plaintiff's claim under Or. Rev. Stat. § 659A.199 challenging the termination of his employment may proceed to trial.

**IT IS SO ORDERED**.

DATED this 3rd day of July, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge